IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ROBERT JAMES CAMPBELL, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | Civil Action 4:14-cv-01241 |
| vs. | § | |
| | § | |
| BRAD LIVINGSTON, et al, | § | |
| Defendants. | § | |
| | § | |

**DEFENDANTS' OPPOSITION TO TEMPORARY INJUNCTIVE RELIEF
AND MOTION FOR TEMPORARY RESTRAINING ORDER
SEEKING STAY OF EXECUTION**

Plaintiff Robert James Campbell filed suit pursuant to 42 U.S.C.
§ 1983, alleging that Defendants' failure to disclose information about the
pentobarbital the Texas Department of Criminal Justice (TDCJ) plans to use
during his scheduled execution (including the source of the drug, how it is
prepared, and who has tested it) violates or threatens to violate his right to
be free from cruel and unusual punishment under the Eighth and Fourteenth
Amendments, right of access to the courts and right to due process of law
pursuant to the Fourteenth Amendment, and violations of the Supremacy
Clause. Complaint, ECF No. 1. Campbell additionally moves for a temporary
restraining order (TRO) that seeks to stay the impending execution date[1]
until after his claims are reviewed and resolved on the merits. Complaint,

---

[1]    Campbell is currently scheduled to be executed after 6:00 p.m. on Tuesday,
May 13, 2014.

ECF No. 1 at 21-22. Consistent with TDCJ's July 9, 2012 Execution Procedure and its practice during the last ten executions, Defendants plan to administer a 5 gram dose of pentobarbital obtained from a licensed compounding pharmacy within the United States. The specific batch in question has been tested by an independent lab, and has a potency of 108%, and is free of contaminants. Because Campbell fails to make the required showing of a substantial likelihood of success on the merits, the Court should deny the extraordinary remedy of injunctive relief and stays of execution.

## FACTUAL AND PROCEDURAL HISTORY

## I.    STATEMENT OF THE CASE

Campbell was convicted and sentenced to die for the capital murder of Alexandra Rendon. 1 CR 207, 238-39. The Texas Court of Criminal Appeals affirmed Campbell's conviction and sentence on direct appeal, and certiorari review was denied. *Campbell v. State*, 910 S.W.2d 475 (Tex. Crim. App. 1995), *cert. denied*, 517 U.S. 1140 (1996). Later, Campbell's state application for writ of habeas corpus was denied by the Court of Criminal Appeals based on the trial court's findings of fact and conclusions of law. *Ex parte Campbell*, No. 44,551-01 (Tex. Crim. App. Mar. 8, 2000) (unpublished order). Campbell subsequently filed his federal habeas petition in the district court on November 2, 2000. 1 ROA 301-489. The district court entered an order on

March 19, 2003, denying relief. *Campbell v. Cockrell*, No. H-00-3844. The district court declined a certificate of appealability, as did the Fifth Circuit. *Campbell v. Dretke*, 117 Fed. Appx. 946 (5th Cir. 2004) (unpublished). During the pendency of the federal habeas application, Campbell filed a second state habeas application raising *Atkins v. Virginia*, 536 U.S. 304 (2002). The CCA dismissed the application as an abuse of the writ. *See Ex parte Campbell*, No. WR-44,551-02 (Tex. Crim. App. July 2, 2003) (not designated for publication). In 2001, also during the pendency of the federal habeas application, Campbell petitioned the Texas courts for postconviction DNA testing, which the trial court granted on April 2, 2002. The test results further confirmed Campbell's guilt:

> [Campbell] could not be excluded as a contributor to the sperm fractions of the DNA extract from the victim's vaginal or anal samples. The probability of selecting an unrelated African-American male at random who could be a contributor to the anal mixture was reported as 1 in 620,000.

*Ex parte Campbell*, 226 S.W.3d 418, 423-24 (Tex. Crim. App. Apr. 25, 2007). (quotation marks omitted).

Campbell next sought leave to file a successive federal habeas application raising an *Atkins* claim. The Fifth Circuit denied leave, finding Campbell failed to make a prima facie showing of retardation. *In re Campbell*, 82 Fed. Appx. 349 (5th Cir. 2003) (unpublished). In August of

2006, Campbell returned to state court to file a third state habeas application raising *Brady* and actual-innocence claims. The CCA dismissed the application as an abuse of the writ. *Ex parte Campbell*, 226 S.W.3d at 425.

On September 5, 2012, Campbell filed his fourth state habeas application in the trial court, raising alleged error in the jury charge. *See Ex parte Campbell*, No. AP-76,907 (Tex. Crim. App. Nov. 7, 2012), Pet. App. A. The CCA, noting that "the law has further developed since applicant filed his last habeas application," looked past the state procedural rule on successive state habeas applications, *see* Tex. Code Crim. P. art. 11.071 §5, and denied the claim on the merits. That denial was the basis for a petition for certiorari, which was also denied. *Campbell v. Texas*, 134 S. Ct. 53 (2013).

Campbell is scheduled for execution Tuesday, May 13, 2014. In relation to that event, Campbell has filed another state habeas application seeking relief under *Atkins*. Campbell also filed this § 1983 suit seeking temporary and permanent injunctive relief.

## II.    Facts of the Crime

Alexandra Rendon left her job at Bank One on Thursday, January 3, 1991, between 10:00 and 10:30 p.m. 57 RR 9-10. Rendon was dressed in a white leather skirt, white stockings, white shoes, a black blouse, and a long wool cream-colored dress coat with snake skin patches on the shoulders.  57

RR 9, 16-17. She also wore a high school graduation ring, an engagement ring, a watch, and a bracelet. 57 RR 18-20. Rendon carried several credit cards in her purse, including a Chevron, VISA, and Mastercard. 57 RR 108. Rendon drove a white Ford Topaz, which had a gray interior and a standard transmission. 57 RR 16. After leaving work, Rendon stopped and purchased gasoline at 10:53 p.m. at a Chevron service station located near her place of employment. 57 RR 71-76.

Earlier that same evening, Campbell and Leroy Lewis were dropped off near the Chevron service station by a friend, Jessie Jean Criff, who had been asked whether he wanted to "make some money." 60 RR 938-40. The following morning Campbell went to Carey Dion Pennamon and told Pennamon to hold the pistol he had used to shoot a woman in the back. 58 RR 403, 405. Campbell told Pennamon that he ordered the woman "run, bitch, run," and then shot at her head, but missed. 58 RR 409-10. Campbell said he then ran up close to the woman and shot her in the back. 58 RR 409-10. Pennamon saw Campbell driving a car and wearing a class ring on his little finger, both of which were identified as belonging to Rendon. 57 RR 106, 107; 58 RR 408-09. Campbell also showed Pennamon the watch he had taken from the woman and told Pennamon that he had given two other rings taken from the woman to Lewis. 58 RR 406-07. In addition, Campbell told Pennamon

- 5 -

that he had stolen $40, a coat, and a white leather skirt from the woman. 58 RR 407-08, 410. Campbell gave the coat to his mother as a Christmas present. 58 RR 407.

On the same day, Lawrence Thomas also saw Campbell driving a car, which was identified as belonging to Rendon. 57 RR 106; 58 RR 144-45. In the car, Thomas saw a white leather skirt and Campbell stated that it had come from the lady he had shot. 58 RR 148-49. Campbell gave Thomas a similar account of abducting and murdering Rendon, stating that he and Lewis saw Rendon at a service station where they forced her into her car and took her to a location on Holmes Road. After Campbell told her to "walk in the bushes," he fired two shots at her because he missed her with the first shot. The second shot struck the woman in the back.  58 RR 145-47. Later, Campbell pointed out to Thomas the exact location where he had killed Rendon.  58 RR 149.

Also on January 4, 1991, Lewis paid Criff $7 for having given him and Campbell a ride the previous evening. 60 RR 941. Criff observed Campbell driving a white car similar to a Taurus or Tempo. 60 RR 942. Campbell gave Criff a similar account of the crime as he had previously given to others. This time, in addition to explaining that he shot at the victim twice, hitting her

with the second shot, Campbell also said that he had sex with the victim and that he shot her because she did not have any money. 60 RR 943-45.

On January 6 or 7, 1991, Campbell was watching television with Otha Norton, Rochelle Pearson, Sheila Robeson, and Edward Hampton when a story came on the 6 o'clock news concerning a missing bank teller. 60 RR 1001-04. Campbell stated, "That's the bitch we killed." 60 RR 1004; *see also* 60 RR 1023-28. Later that day or the next day, Campbell showed Norton a white leather skirt, and Norton threw it away. 60 RR 1004. Robeson had been offered the skirt, but she refused it because it was dirty. 60 RR 1028-29.

On January 7, 1991, Campbell, Lewis, Norton, and Pearson were riding in a small white car, which was identified as belonging to Rendon. 60 RR 997, 1034. On their way to Sharpstown Mall, the car ran out of gas or broke down. 60 RR 998. Campbell steered the car while the others pushed the car to a Chevron service station and parked it. 60 RR 998. Campbell told Norton that this service station was where he had stolen the car. 60 RR 999. After police recovered the car, Norton's palm print was found on the trunk and Lewis' left index fingerprint was recovered from inside of the passenger door window. 60 RR 1135.

On January 3 and 4, 1991, Gladys Santana telephoned her daughter, Alexandra Rendon, but her daughter never answered. 58 RR 104-05.   On

Saturday, January 5, 1991, Santana went to Rendon's apartment and discovered that she was missing.  58 RR 105. Santana called the police. *Id.*

On January 14, 1991, Lawrence Thomas directed the police to the location where Campbell had told him he killed the victim. 58 RR 289. Rendon's body was located approximately twenty yards from the roadway.  58 RR 290, 310. She was lying face down in approximately three inches of water and was wearing only a blouse and bra. *Id.* Rendon's purse, wallet and other items were recovered nearby. 58 RR 312, 315, 318, 327, 329. Her panties were recovered alongside the roadway. 58 RR 329.

An autopsy revealed that the cause of death was a gunshot wound to the left side of the victim's back. 59 RR 493. The bullet entered the pelvis, severed an artery that goes to the left thigh, and then lodged in the abdomen. *Id.* Further, DNA testing was performed from the vaginal swabs taken from the victim. The DNA testing revealed the presence of sperm in the vagina of the victim from at least two different men, and neither Campbell nor Lewis could be excluded as possible donors of the sperm.  59 RR 876-79.

On January 15, 1991, the police arrested Campbell at his mother's house.  58 RR 380, 391. After obtaining a written consent to search from Campbell's mother, the police recovered the coat which was identified as belonging to Rendon. 57 RR 9-10; 59 RR 685. The police then proceeded to the

apartment occupied by Pennamon, who gave his consent to search his apartment. 58 RR 393. The police recovered the gun Campbell had given to Pennamon, which matched the gun used to kill Rendon. 58 RR 393-95; 60 RR 1147. Finally, on January 28, 1991, Campbell's girlfriend, Demetrius Brown, was observed wearing Rendon's watch and class ring. 60 RR 1080-82.

## STANDARD OF REVIEW

The Supreme Court recognized a narrow exception to the general rule that prevents federal courts from granting stays where a state's execution procedures would not comport with the Constitution. *See Baze v. Rees*, 553 U.S. 35, 61 (2008); *Hill v. McDonough*, 547 U.S. 573, 583-85 (2006); *Nelson v. Campbell*, 541 U.S. 647, 650 (2004). Merely "[f]iling an action that can proceed under § 1983 does not entitle the complainant to an order staying an execution as a matter of course." *Hill*, 547 U.S. at 583-84. Rather, "a stay of execution is an equitable remedy that is not available as a matter of right, and equity must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Nelson*, 541 U.S. at 649-50.

To be entitled to a preliminary injunction or a stay of execution, a movant must show "a substantial likelihood of success on the merits" and that the balance of harms tips in his favor. *See Tamayo v. Stephens*, No. 14-

70003, 2014 WL 241744, at *3 (5th Cir. Jan. 22, 2014) (citing *Adams v. Thaler*, 679 F.3d 312, 318 (5th Cir. 2012) (stay of execution), and *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011) (preliminary injunction)). When the requested relief is the "extraordinary remedy" of preliminary injunction, a movant must establish:

> (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*Sepulvado v. Jindal*, 729 F.3d 413, 417 (5th Cir. 2013) (quoting *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009) (quoting *Speaks v. Kruse*, 445 F.3d 396, 399-400 (5th Cir. 2006)), *r'hrg. denied*, 739 F.3d 716 (Dec. 23, 2013), *cert. denied* 2014 WL 284957 (Apr. 7, 2014). Similarly, when the requested relief is a stay of execution, a court must consider:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceed; and (4) where the public interest lies.

*Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

In either instance, the remedy should only issue if the movant has clearly carried the burden of persuasion on all four requirements. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) ("'It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'") (quoting 11A Charles Alan Wright et al., Federal Practice and Procedure § 2948 (2d ed. 1995) (alteration in original)); *Hill*, 547 U.S. at 484 ("[I]nmates seeking time to challenge the manner in which the State plans to execute them must satisfy all of the requirements for a stay, including a showing of a significant possibility of success on the merits.") (citing *Barefoot v. Estelle*, 463 U.S. 880, 895-06 (1983), and *Mazurek*, *supra*.)); *see Nken*, 556 U.S. at 433-34 ("The party requesting a stay bears the burden of showing that the circumstances justify an exercise of [judicial] discretion.") (citing *Clinton v. Jones*, 520 U.S. 681, 708 (1997); *Landis v. North American Co.*, 299 U.S. 248, 255 (1936)).

## ARGUMENT

### I. Campbell Has No Likelihood of Success, Much Less a Substantial One, on the Merits of His Claims.

As argued herein, Campbell has no substantial likelihood of succeeding on the merits of any of his claims. *See*, *e.g.*, *Nken*, 556 U.S. at 434 ("It is not

enough that the chance of success on the merits be better than negligible.")
(internal quotation marks omitted). Indeed, this litigation is foreclosed by
Fifth Circuit precedent, and recent problems in another state following an
entirely different execution procedure do nothing to change this fact. *Sells v.
Livingston, et. al*, 2014 U.S. App. LEXIS 6381 (5th Cir. Apr. 7, 2014). The
Court should therefore deny Campbell's motion for injunctive relief and
restraining order.

    **A.**    **Campbell's Eighth Amendment claim is foreclosed under *Baze*.**

    Eighth Amendment challenges to a State's method of execution require
two showings, that (1) the State's proposed method of execution entails "a
substantial risk of serious harm" that is "*sure or very likely* to cause serious
illness and needless suffering," *Baze*, 553 U.S. at 36, 49-50, and (2) that the
petitioner has proposed a "feasible, readily implemented [alternative
procedure that will] in fact significantly reduce a substantial risk of severe
pain," *id.* at 52. Indeed, it would be insufficient to provide "a slightly or
marginally safer alternative." *Id.* at 51. Campbell's underlying Eighth
Amendment claim cannot meet these standards.

1.   **Campbell cannot demonstrate that Texas's current execution protocol poses a demonstrated risk of severe pain.**

The Constitution does not require the elimination of all risk of pain. *Baze*, 553 U.S. at 47. Rather, only if "conditions presenting the risk [are] '*sure* or *very likely* to cause serious illness and needless suffering,' and give rise to 'sufficiently *imminent* dangers'" will there be an Eighth Amendment claim. *Id.* at 50 (quoting *Helling v. McKinney*, 509 U.S. 25, 33, 33-35 (1993)) (emphasis added by the *Baze* Court). To prevail on such a claim, "there must be a 'substantial risk of serious harm,' an 'objectively intolerable risk of harm' that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.'" *Id.* at 50-51 (quoting *Farmer v. Brennan*, 511 U.S. 825, 846, & 847 n.9 (1994)). And "[s]imply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of 'objectively intolerable risk of harm' that qualifies as cruel and unusual" under the Eighth Amendment. *Id.* at 50. Campbell's speculative and conclusory statements fall far short of demonstrating a significant risk of severe pain. Moreover, Campbell cannot use evidence of an execution from another state following a different protocol to transform his speculation into the required significant showing.

Defendants are not using any new method or new protocol to carry out Campbell's scheduled execution. Indeed TDCJ has carried out three executions with the same drug from the same supplier, which is vastly different from the situation in Oklahoma in which an admittedly new protocol was used.[2] Campbell's rank speculation that TDCJ could or would switch procedures at any time is not worthy of belief. TDCJ informed Campbell he would be executed in accordance with the TDCJ's July 9, 2012 Execution Procedure which calls for administering a 5 gram dose of pentobarbital. EXHIBIT A. This is a fact he does not dispute. Complaint, ECF No. 1, at 12 (#45). TDCJ's possession of other drugs in no way changes its policies or intent and is indicative of nothing. Pentobarbital, unlike the midazolam used in Oklahoma, has been used effectively across the nation and in thirty-three executions in Texas,[3] the most recent being the April 16, 2014 execution of Jose Villegas. The Fifth Circuit has decided that Texas's single-drug protocol is acceptable under *Baze. Sells v. Livingston,* 2014 U.S. App. LEXIS 6381; *Thorson v. Epps*, 701 F.3d 444, 447 n.3 (5th Cir. 2012). Similarly, the Ninth Circuit has also held that a procedure involving only a single dose of pentobarbital is consistent with the Eighth

---

[2]      *Lockett v. Evans*, 2014 OK 34, fn. 2 (Okla. 2014).

[3]      http://www.tdcj.state.tx.us/death_row/dr_executed_offenders.html (last visited May 6, 2014).

Amendment.[4] *Towery v. Brewer*, 672 F.3d 650, 659 (9th Cir.), *cert. denied*, 132 S. Ct. 1656 (2012).

Defendants safely and successfully used pentobarbital from a licensed compounding pharmacy for seven executions in Texas, which was tested at 98.8% potency, and those executions all concluded without incident. Further, since switching to a different and undisclosed compounding pharmacy, the Defendants have safely and successfully carried out three more executions without incident. To the extent, Campbell points to press accounts from the last execution wherein Villegas notes that "it does kind of burn," Defendants pointedly note that the Supreme Court has never held an execution must be painless. *Baze*, 553 U.S. at 47. As the Supreme Court has stated, "The cruelty against which the Constitution protects a convicted man is the cruelty inherent in the method of punishment, not the necessary suffering involved in any method employed to extinguish life humanely." *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 464 (1947); *also cited* by *Raby v. Livingston*, 600 F.3d 552, 562 (5th Cir. Tex. 2010). Again, Campbell fails to show the "conditions presenting the risk [are] '*sure* or *very likely* to cause

---

[4]     It is noteworthy that, in *Baze*, the inmate petitioners proposed a one-drug barbituate-only protocol, using either Pentobarbital or Sodium Thiopental as the suggested alternative drug. 553 U.S. at 56-58.

serious illness and needless suffering,' and give rise to 'sufficiently *imminent* dangers.'" *Baze*, 553 U.S. at 50.

Conspicuously omitted from Campbell's briefing is any mention of Texas's recent record in conducting humane executions. Instead, Campbell cites cases from the 1980's and 90's, with the most recent being over fifteen years old. Complaint, ECF No. 1 at 13-14. Defendants now intend to use pentobarbital from a licensed compounding pharmacy within the United States, and the pentobarbital to be used was independently tested at 108% potency. EXHIBIT B (redacted laboratory report).[5] Any concerns about the drug's origin and reliability are alleviated once the drug has been tested and its potency confirmed, both which have been done here. The Court should thus reject Campbell's speculative claims regarding the efficacy of the drug. *See Whitaker v. Livingson*, 732 F.3d 465, 467-69 (5th Cir. 2013) (rejecting claims where compounded pentobarbital had a potency of 98.8%);[6] *Chester v. Wetzel*, No. 1:08-cv-1261, 2012 WL 5439054, at **7-8 (M.D. Pa. 2012)

---

[5]     Defendants have previously informed Campbell that his executions would be conducted under TDCJ's 2012 single-drug protocol using pentobarbital, and that the specific batch of drugs has a potency of 108%, although the identity of the pharmacy and independent laboratory were not disclosed for reasons explained below.

[6]     The *Whitaker* § 1983 lawsuit originated in this Court. In October 2013, United States District Judge Lynn Hughes denied a motion for preliminary injunction and emergency motion for stay which was based arguments identical to those currently raised to this Court. *Thomas Whitaker, et al. v. Brad Livingston, et al.*, No. 4:13-cv-02901 (S.D. Tex.) (ECF No. 21) (Amended Opinion on Preliminary Injunction). EXHIBIT C.

(rejecting claims where compounded pentobarbital had a potency of 96.6%). Furthermore, Campbell's unsupported allegations regarding the drug being too potent are also without merit. Complaint, ECF No. 1, at 10 (#38). As shown by the lab report, a drug is in the proper potency range if it is between 90% and 110% potent. EXHIBT B.

Media accounts regarding the executions of seven Texas inmates administered a single dose of pentobarbital from a licensed compounding pharmacy additionally refute Campbell's speculation about potential harm or threat of harm.

| Inmate | Date | Time of Death | Media Comment |
|---|---|---|---|
| Anthony Doyle | 03/27/14 | 6:49 | "The prisoner's eyes closed as the sedative pentobarbital was injected. He took a few deep breaths, then began to snore quietly. Soon, he stopped moving. He was pronounced dead 25 minutes later, at 6:49 p.m."<br><br>Michael Gracyk, "Texas Man Put to Death for Delivery Woman Slaying," Associated Press, March 27, 2014, 7:18 pm. |

| Ray Jasper | 03/19/14 | 6:31 | "As the drugs started to take effect, [Jasper] took a couple of deep breaths, then began snoring—each snore less noticeable until all movement stopped. He was pronounced dead at 6:31 p.m. CDT—20 minutes after being given the lethal drug."<br><br>Michael Gracyk, "Ex-rapper Ray Jasper Put to Death for Studio Owner's Killing," Associated Press, March 20, 2014, 10:37 AM. |
| --- | --- | --- | --- |
| Suzanne Basso | 02/05/14 | 6:26 | "As the lethal dose of pentobarbital took effect, Basso, dressed in a white prison uniform, began to snore. Her deep snoring became less audible and eventually stopped. She was pronounced dead at 6:26 p.m. CST, 11 minutes after the drug was administered."<br><br>Michael Gracyk, "Woman Executed in Texas for 1998 Torture Killing," Associated Press, Feb. 5, 2014. 7:53 PM EST. |

| Edgar Tamayo | 01/22/14 | 9:32 | "As the lethal dose of pentobarbital began taking effect, [Tamayo] took a few breaths and then made one slightly audible snore before all movement stopped. He was pronounced dead 17 minutes after the drug was administered, at 9:32 p.m. CST."<br><br>Michael Gracyk, "Convicted Cop Killer Edgar Tamayo Executed in Texas Despite Outcry from Mexico, U.S. State Department," Associated Press Jan. 23, 2014 12:13 PM ET. |
| --- | --- | --- | --- |
| Jerry Martin | 12/03/13 | 6:27 | "As the lethal dosage began being applied, Martin said, 'Jesus,' along with some incoherent words, and then began to slip under the effects of the drug. . . . A doctor pronounced him dead at 6:27 p.m., some eleven minutes after those final words."<br><br>Michael Gracyk, "Texas Executes Man for Huntsville Corrections Officer's Death," Associated Press Email updated Wed. 7:49 AM, Dec. 04, 2013. |

| Jamie McCoskey | 11/12/13 | 6:44 | "McCoskey let out a loud laugh, then began taking deep breaths that became several snores. He was pronounced dead at 6:44 p.m. CST, 19 minutes after the lethal drug began to be administered."<br><br>Michael Gracyk, "Texas Executes Man for Fatal Stabbing During Houston Couple's Abduction, Rape," Associated Press Email updated Wednesday, Nov. 13, 2013, 2:14 AM. |
| --- | --- | --- | --- |
| Michael Yowell | 10/09/13 | 7:11 | "[Yowell] took several deep breaths, then began snoring. Within about 30 seconds, all movement stopped. He was pronounced dead 19 minutes later at 7:11 p.m. CDT."<br><br>Michael Gracyk, "Michael Yowell Executed for Killing Parents in Texas," Associated  Press Oct. 9, 2013, 08:24 PM ET. |

Importantly, the media reports are very consistent and indicate no substantial difference in inmate reactions in those seven executions versus the three most recent executions using pentobarbital from the undisclosed source and the twenty-two inmates who were administered a single dose of pentobarbital from an FDA-regulated pharmacy. EXHIBIT D (chart showing media descriptions for all thirty-three Texas executions using a single dose of pentobarbital). The vast majority of all the Texas inmates simply began

snoring as they slipped into unconsciousness, and a short time later were pronounced dead.

Campbell nevertheless contends that the use of pentobarbital from a compounding pharmacy may add an unacceptable risk of pain, suffering and harm. He asserts that dangers exist from the use of such drugs because compounding pharmacies are not subject to FDA regulation and oversight, active pharmaceutical ingredients used in compounding might be counterfeit, and compounded drugs could be contaminated. Campbell also maintains that the process does not allow him to prove that the use of the drug is cruel unless he is first provided all the technical data regarding where the compounded pentobarbital comes from, how it was prepared, and who tested it. But Campbell's claims of prospective injury fail.

The Fifth Circuit has already held that an uncertainty as to the method of execution is not a cognizable liberty interest. *Sepulvado*, 729 F.3d at 419-20; *see also Whitaker*, 732 F.3d at 468. And the Fifth Circuit has already reviewed a challenge (that arose in this Court) regarding TDCJ's use of pentobarbital from a compounding pharmacy. *Whitaker*, 732 F.3d at 468. The Fifth Circuit denied a stay of execution for Michael Yowell and refused to allow additional discovery into the use of a dose of pentobarbital. *Id.* at 469.

The Fifth Circuit explained: "[i]f the state were using a drug never before used or unheard of, whose efficacy or science was completely unknown, the case might be different. The state, however, will use a standard amount of pentobarbital[.]" *Id.* at 468. Campbell could not satisfy the Eighth Amendment by pointing to "unknowns because of the possibility of contamination." *Id.*; *see also id.* (cataloguing plaintiffs' complaints that compounding pharmacies are not subject to the same FDA regulations and the sources of the pharmacies' active ingredients was not known). Instead, "plaintiffs must point to *some* hypothetical situation, based on science and fact, showing a likelihood of severe pain." *Id.* (emphasis by the court). The Fifth Circuit concluded that even if all the contentions were true, "what plaintiffs are demanding is that, in effect, they be permitted to supervise every step of the execution process. They have no such entitlement." *Id.* While Campbell may prefer drugs from an FDA regulated pharmacy, federal courts are not "boards of inquiry charged with determining 'best practices' for executions." *Baze*, 553 U.S. at 51. Just as in *Whitaker*, Campbell has failed to identify any hypothetical situation, based on science and fact, showing a likelihood of severe pain and, therefore, his Eight Amendment claim necessarily fails. The court reaffirmed this holding mere weeks ago. *Sells v. Livingston*, 2014 U.S. App. LEXIS 6381. The Fifth Circuit has thus already

rejected the very constitutional challenge that Campbell asserts to this Court.

Likewise, the Supreme Court has recently rejected a similarly speculative constitutional challenge. In *Brewer v. Landrigan*, 131 S. Ct. 335 (2010), the Supreme Court vacated a stay of execution based upon a claim that the use of an execution drug from a non-FDA-approved source raises questions regarding its efficacy.  In a one paragraph opinion, the Supreme Court held:

> There is no evidence in the record to suggest that the drug obtained from a foreign source is unsafe. The district court granted the restraining order because it was left to speculate as to the risk of harm. But speculation cannot substitute for evidence that the use of the drug is "*sure or very likely* to cause serious illness and needless suffering."

*Id.* at 445 (quoting *Baze*, 553 U.S. at 50) (additional citation omitted).

Campbell argues that he is entitled as a matter of state law to information about the drugs Defendants will use to carry out their executions. Complaint, ECF No. 1 at 6, n. 1, 8-10. Indeed, Campbell admits the issue of disclosure is currently being litigated in state court. *Id.* at 6, n. 1. But previous state law open record rulings were fact specific and circumstances have changed. As stated above, Defendants have informed Campbell that he will be executed with a 5g dose of pentobarbital obtained

from a licensed compounding pharmacy within the United States. Defendants have further informed Campbell that the pentobarbital to be used has been tested by an independent laboratory and found to be 108% potent and free from contaminants. What Campbell actually asserts is that he is entitled to know the identity of the pharmacy from whence the pentobarbital came. But the Fifth Circuit has twice rejected that assertion. *Sells v. Livingston, et. al*, 2014 U.S. App. LEXIS 6381; *Sells v. Livingston, et. al,* 2014 U.S. App. LEXIS 6128 (5th Cir. Apr. 2, 2014)(unpublished).

Further, Defendants have legitimate reason to believe that disclosing the identity of the pharmacy will create a substantial risk of physical harm to the pharmacy and its employees, based upon specific bomb threats delivered to a similarly situated pharmacy which planned to supply drugs for use in executions. EXHIBIT E (threat assessment from DPS). Not only is the identity of the pharmacy excepted from disclosure pursuant to the law enforcement exception contained in Texas Government Code section 552.108, it is excepted under the physical-safety exception of section 552.101 and the Texas Supreme Court's decision in *Texas Department of Public Safety v. Cox Tex. Newspapers*, L.P., 343 S.W.3d 112 (Tex. 2011).[7]

---

[7]      In *Sells* and *Hernandez,* the district court ordered, in a TRO, that TDCJ disclose information that it asserts is exempt from disclosure under state law. TDCJ is currently seeking a ruling for the Attorney General on whether that information

To the extent Campbell claims that pentobarbital from an unknown source might leave him in pain without killing him, then he is not entitled to relief. Not only does such an assertion fail to meet *Baze*'s requirement that he establish a "demonstrated risk of severe pain," but Texas's existing execution procedure has safety measures in place to guard against such an occurrence. Notably, the Fifth Circuit has specifically signed off on this protocol in *Raby v. Livingston*, 600 F.3d 552, 562 (5th Cir. Tex. 2010), with the only change from that protocol being the switch from three drugs to the single dose of pentobarbital which the circuit court has also approved. *Sells v. Livingston,* 2014 U.S. App. LEXIS 6381; *Thorson v. Epps*, 701 F.3d 444, 447 n.3 (5th Cir. 2012). Under TDCJ's July 2012 protocol (EXHIBIT A), executions are carried out by a qualified "drug team" including at least one medically-trained individual. *Raby*, 600 F.3d at 555. Prior to an execution, the drug team

is subject to disclosure. Attorney Maurie Levin is one of the original Requestors under the Public Information Act; therefore, the TRO requires disclosure of the information to the Requestor. Even a protective order limiting disclosure to the attorneys in this case would moot TDCJ's right to administrative and judicial review of its Public Information Act obligations under state law. As the Texas Supreme Court has recognized, any interlocutory order requiring pre-judgment disclosure of information a government entity seeks to except will shut off the appeals process, depriving the government of the full protections of the appellate process. *See In re Dallas Area Rapid Transit*, 967 S.W.2d 358, 359-360 (Tex. 1998). By ordering disclosure of the requested information in a TRO, even subject to a protective order, the lower court short-circuited the review process and would have effectively mooted TDCJ's rights under the Public Information Act. The Fifth Circuit therefore properly reversed the lower court in both cases. *Sells v. Livingston, et. al*, 2014 U.S. App. LEXIS 6381; *Sells v. Livingston, et. al,* 2014 U.S. App. LEXIS 6128.

prepares two syringes containing the pentobarbital (the second is kept as a back-up). To begin the execution, a medically trained individual inserts two intravenous catheters (the second line is started only as a precaution and is used only if a potential problem is identified in the primary line). *Id.* at 556. The saline solution is discontinued and the pentobarbital is administered, followed by a saline flush of the line. After a sufficient enough time, if there are visible signs that the inmate is still awake despite administration of the drug, the drug team administers a second dose, followed by the saline flush. EXHIBIT A. A physician then enters the execution chamber to examine the inmate and pronounce him dead.

Campbell has no chance of succeeding on an Eighth Amendment claim where he would be executed with pentobarbital with 108% potency under procedures fully designed to minimize any pain and suffering.

> ### 2. Campbell fails to state a viable cause of action because he fails to identify a more humane method of execution.

An Eighth Amendment claim under *Baze* also requires a showing that the "demonstrated risk of severe pain" is "substantial *when compared to the known and available alternatives.*" *Baze*, 553 U.S. at 61 (emphasis added). Proposing marginally safer alternatives will not suffice. Rather, the proposed alternative "must effectively address a substantial risk of serious harm," and

"must be feasible, readily implemented, and in fact significantly reduce a substantial risk of severe pain." *Id.* at 52 (quotation omitted).

Campbell offers no alternative method of execution whatsoever. The Court should not entertain any argument from Campbell that he needs information from Defendants in order to meet his burden under *Baze*'s prong two—that burden rests solely on his provision of a readily available alternative to using pentobarbital from a compounding pharmacy. As the Eighth Circuit recently explained, even if petitioner's hypothetical situations were to come to pass, they would demonstrate only a risk of pain, not that the risk was substantial when compared to known and available alternatives:

> Without a plausible allegation of a feasible and more humane alternative method of execution, or a purported design by the State to inflict unnecessary pain, the plaintiffs have not stated an Eighth Amendment claim based on the use of compounded pentobarbital. . . . It was therefore a clear abuse of discretion for the district court to allow the claim to proceed and to order on that basis discovery or sensitive information, the disclosure of which Lombardi avers would prevent the State form acquiring lethal chemicals necessary to carry out the death penalty.

*In re Lombardi*, 741 F.3d 888, 896 (8th Cir. 2014) (en banc), *cert. denied,* 2014 WL 319756 (Apr. 7, 2014). Because Campbell fails to state a viable cause of action, the Court is precluded from issuing injunctive relief or a stay.

### B. Campbell cannot show a "substantial likelihood of success on the merits" on his remaining claims.

Campbell additionally contends that Defendants' failure to disclose information regarding the pentobarbital in a timely manner violates a constitutional right of access to the courts. Campbell's access-to-courts claim hinges on whether he has "pled sufficient facts to state a cognizable [Eighth Amendment] claim" which, in this case, he has not. *Whitaker*, 732 F.3d at 467 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face.)). In *Whitaker*, the Fifth Circuit rejected a similar access-to-courts claim where plaintiffs complained of TDCJ's failure to give timely information about how it intended to execute Michael Yowell. 732 F.3d at 467. The Fifth Circuit reasoned that the plaintiff "must show some likelihood of success on the merits of the Eighth Amendment claim," and not argue that if he only had more time that he then might be able to make that showing. *Id.* The Court should therefore reject Campbell's allegations that he needs additional time and information regarding the pentobarbital in order to assess the viability and constitutionality of his impending execution.

Campbell further contends that by failing to disclose information regarding the source of the pentobarbital, Defendants have thwarted the Supremacy Clause by hindering his ability to vindicate his federal constitutional rights. But, the Supremacy Clause "does not provide its own cause of action," but instead merely makes the Eighth Amendment effective against the state. *Whitaker*, 732 F.3d at 467 (citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 176-80 (1803), and *McCulloch v. Maryland*, 17 U.S. (4 Wheat) 316, 406 (1819)). Because Campbell cannot show a substantial likelihood of success on the merits, the Court must deny injunctive relief and a restraining order.

Finally, Campbell argues that TDCJ's failure to provide timely notice about the pentobarbital has violated his right to due process under the Fourteenth Amendment. To make such a claim, Campbell "must demonstrate a cognizable liberty or property interest." *Whitaker*, 732 F.3d at 467 (citation omitted). This claim is foreclosed by Fifth Circuit precedent which holds that uncertainty as to the method of execution does not amount to a cognizable liberty interest. *Sepulvado*, 729 F.3d at 419-20; *see also Whitaker*, 732 F.3d at 468. Regardless, in Texas, the execution protocol has remained unchanged since July 2012. The only thing that is different is the pharmacy from which Defendants obtain the pentobarbital, and the result that the specific batch

that will be used in Campbell's currently scheduled execution tests at 108% potency. Having failed to identify an enforceable right that a preliminary injunction might safeguard, Campbell cannot prevail on the merits.

## II. Campbell Cannot Show that the Balance of Harms Favors an Injunction.

Finally, it is not in the public interest to grant an injunction. A stay of execution is an equitable remedy and, as such, it "must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Hill*, 547 U.S. at 384 (citing *Nelson*, 541 U.S. at 649-50). So, too, an injunction against a particular method of execution must not ignore the State's interests. Campbell's state and federal collateral proceedings have long run their course in the many years since he was sentenced to death. The State has an interest in seeing that its laws are enforced and in carrying out executions as scheduled. Further unnecessary delay hinders that interest. Similarly, the needless uncertainties and expense that come from unwarranted delay in death penalty cases, as well as the impact of such delay upon the friends and families of victims and their communities, is only compounded by issuance of unwarranted injunctive relief. This is especially true where, as here, Campbell cannot succeed on the merits of his claims. *See supra* Part I.

## CONCLUSION

Defendants request that the Court deny injunctive relief and deny the request for a restraining order.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

DON CLEMMER
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL,
Chief, Criminal Appeals Division


*Counsel of Record

s/ Ellen Stewart-Klein*
Assistant Attorney General
Criminal Appeals Division
Texas Bar No. 24028011
Southern District No. 27861

Office of the Attorney General of Texas
P.O. Box 12548, Capitol Station
Austin, Texas  78711-2548
(512) 936-1600
(512) 320-8132 fax

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I certify that on May 7, 2014, I filed an electronic copy of this Response in Opposition with the Clerk of the Court using the ECF system.  Service of the pleading on the Campbell's attorneys of record was automatically accomplished through the Notice of Electronic Filing:

Maurie Levin
Texas Bar No. 00789452
Attorney at Law
211 South Street, #346
Philadelphia, PA 19147
Tel.: (512) 294-1540
Fax: (215) 733-9225
maurielevin@gmail.com

Jonathan J. Ross
Texas Bar No. 00791575
Susman Godfrey L.L.P.
1000 Louisiana St., Suite 5100
Houston, TX 77002-5096
Tel.: (713) 651-9366
Fax: (713) 654-6666
jross@susmangodfrey.com


Robert C. Owen
Northwestern University School of Law
Bluhm Legal Clinic
375 East Chicago Ave.
Chicago, IL  60611
(312) 503-0135 – Telephone
(312) 503-8977- Facsimile
Robert.owen@law.northwestern.edu



                    s/ Ellen Stewart-Klein
                    ELLEN STEWART-KLEIN
                    Counsel of Record for Defendants